UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TODD E. SHATKIN, DDS,
SAMUEL SHATKIN, DDS, MD,

**REPORT AND RECOMMENDATION**

Plaintiffs,

07-CV-00332A(M)

v.

ANDREW JAKSON,
IMTEC CORPORATION,
DENTAL TECH LABORATORIES, LLC,
F.I.R.S.T. LABORATORIES, LLC,

Defendants.
_____

This action was referred to me by Hon. Richard J. Arcara to conduct "all pre-trial matters", including "hearing and disposition of all non-dispositive motions" and to "hear and report upon dispositive motions" (Dkt. #11). Before me are defendants' motions for a preliminary injunction (Dkt. ##52, 57) and plaintiffs' cross-motion for partial summary judgment (Dkt. #75). Oral argument of the motions was held on March 19, 2008. At the conclusion of oral argument, I announced my decision on the motions from the bench (incorporated by reference herein), and stated that this written opinion would follow. For the reasons discussed herein, I recommend that the motions be DENIED.

**BACKGROUND**

On September 16, 2003, plaintiff Todd E. Shatkin DDS, along with defendants Andrew Jakson d/b/a Dental Tech Laboratories, LLC ("Dental Tech") and IMTEC Corporation ("IMTEC") created a company known as "F.I.R.S.T. Laboratories LLC" ("FIRST") for the

purpose of exploiting certain technology, allegedly developed by Dr. Todd Shatkin, relating to dental implants. In connection with the creation of FIRST, they executed an "Operating Agreement" (Dkt. #52-2, Ex. A) and a "Licensing/Marketing Agreement" (Dkt. #52-2, Ex. B), and each of them were granted an undivided 1/3 interest in FIRST (Id., §1). Although not an owner, plaintiff Samuel Shatkin, DDS (Todd Shatkin's father) was named treasurer/manager of FIRST (Dkt. #52-2, Ex. A, p. LLC-11).

The Operating Agreement provided that the Licensing/Marketing Agreement "shall be included in this Operating Agreement in its entirety" (Id., Art. XIII(B)), and further stated that "irrespective of the place of execution or performance, this Agreement shall be governed in accordance with the laws of the State of Oklahoma" (Id., Art. XIII(F)).[1]

Section 3 of the Licensing/Marketing Agreement recited that:

> "Shatkin has conceived an idea and concept for fabricated implant restoration of teeth and has filed an application for patent protection with the U.S. Patent & Trademark Office in Washington, D.C. Shatkin hereby grants to FIRST an exclusive license to make, have made, use, lease/sell the TECHNOLOGY and LICENSED PRODUCTS . . . . This grant of exclusive license shall be revoked upon the dissolution, bankruptcy, or voluntary sale of assets of FIRST."

Section 2 of the Licensing/Marketing Agreement provided that the it "shall continue so long as IMTEC continues to promote and market certain intellectual properties granted in an exclusive license to FIRST by Shatkin". Section 3 of that Agreement required IMTEC to "actively promote the FIRST concept and techniques"; §5 required it to "take steps to

---

[1] Under Oklahoma law, "separate documents executed as part of the same transaction may be read together as a single agreement". Sunrizon Homes, Inc. v. American Guaranty Investment Corp., 782 P. 2d 103, 107 (Sup. Ct. Okla. 1988).

incorporate the FIRST technique and method into its product lines and . . . market same on a global basis"; and §7 required it to "use its discretion in marketing the FIRST . . . technique and . . . take steps to blend it with [its] current marketing schemes".

Section 3 of the Licensing/Marketing Agreement also required Jakson/Dental Tech to "retain an independent contractor or licensed dentist as a consultant to review and evaluate case treatment plans submitted by customers of FIRST . . . to render[ ] an opinion whether FIRST should create the ordered restoration".

After the parties had worked together for over three years, on May 22, 2007 Dr. Todd Shatkin faxed a letter to IMTEC and Jakson/Dental Tech (Dkt. #61, Ex. I), purporting to terminate the Licensing/Marketing Agreement due to allegedly material breaches thereof by IMTEC and Jakson/Dental Tech:

> "Please accept this letter as notice of termination of the Licensing/Marketing agreement dated September 16, 2003 (the 'Agreement'). Both IMTEC Corporation and Andy Jakson d/b/a Dental Tech Laboratories, LLC have materially breached the Agreement.
>
> IMTEC has failed to 'actively promote the FIRST concept and technique in dental journal advertisements, seminars, training courses, professional meetings and trade shows' and has failed to incorporate the FIRST technique and method to its product lines. Jakson and Dental Tech have sent misleading and competitive solicitations to FIRST customers and performed work directly for such customers directly competing with FIRST and Dr. Shatkin. In addition, Jakson and Dental Tech have failed and refused to engage a licensed dentist to review cases. Jakson has gone so far as to represent himself to FIRST customers as being engaged in 'treatment planning.' Such actions are contrary to the express terms of the Agreement . . .
>
> As a result of the above, I hereby terminate the Agreement effective immediately."

Immediately thereafter, the Shatkins began marketing the patented technology (which had been licensed to FIRST) through a new company entitled "Samuel Shatkin F.I.R.S.T. LLC" ("Shatkin FIRST").

Defendants Jakson and Dental Tech seek a preliminary injunction prohibiting plaintiffs from utilizing confidential customer information belonging to IMTEC or FIRST (Dkt. #52). Defendants IMTEC and FIRST seek the same relief, as well as a preliminary injunction prohibiting plaintiffs from competing with FIRST (Dkt. #57). Plaintiffs' cross-motion seeks partial summary judgment declaring that the May 22, 2007 termination of the Licensing/Marketing Agreement was proper (Dkt. #75).

## DISCUSSION AND ANALYSIS

I.  **Defendants' Motions for a Preliminary Injunction**

   A.  **Standard for Relief**

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis in original); Sussman v. Crawford, 488 F. 3d 136, 139 (2d Cir. 2007). "A party seeking a preliminary injunction must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a sufficiently serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in [the moving party's] favor". Almontaser v. New York City Department of Education, et al., ___ F. 3d ___, 2008 WL 744243, *2 (2d Cir. March 20, 2008). "The district court has wide discretion in determining whether to grant a preliminary injunction." Id.

**B.     Irreparable Harm**

"Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." Citibank, N.A. v. Citytrust, 756 F. 2d 273, 276 (2d Cir. 1985). The "presumption of irreparable harm is inoperative if the [party] has delayed . . . in moving for preliminary injunctive relief . . . . Though such delay may not warrant the denial of ultimate relief, it may, *standing alone*, preclude the granting of preliminary injunctive relief . . . because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury". Tough Traveler, Ltd. v. Outbound Products, 60 F. 3d 964, 968 (2d Cir. 1995) (emphasis added).

Defendants knew within days of the May 22, 2007 termination that plaintiffs had gone into competition with FIRST. In its answer and counterclaim dated August 1, 2007, FIRST alleged that plaintiffs were "currently doing business under the trade name of FIRST Laboratories, LLC, in direct competition with FIRST LLC and the business of FIRST LLC, and utilizing the proprietary and confidential information of FIRST LLC" (Dkt. #14, p. 22, ¶41), and further alleged that "the court should issue both temporary and permanent injunctions" preventing plaintiffs "from utilizing FIRST LLC's proprietary information and participating in businesses that are in competition with FIRST LLC" (Id., ¶42). However, neither FIRST nor IMTEC moved for a preliminary injunction until November 15, 2007 (Dkt. #57), and Jakson/Dental Tech did not file their current motion until November 5, 2007 (Dkt. #52).

FIRST argues that "management optimistically waited to see how the business performed" going into the month of September 2007 following increased sales in August 2007 (Dkt. #114, Ex. A, ¶12), and that it "did not realize the severity and extent of the damage" to its business by plaintiffs' competition until late September 2007 (Id., ¶5). Elsewhere, FIRST alleges that it did not want to "risk damaging the prospects of settlement" by filing a preliminary injunction motion in advance of a mediation session which was held on November 6, 2007 (Dkt. #114, ¶17). I find these excuses to be unpersuasive. Defendants were clearly aware of the *fact* of injury from plaintiffs' allegedly improper competition long before they filed these motions, but decided to see how things played out before moving for injunctive relief. In fact, to date defendants have not even added Shatkin FIRST (which they allege is improperly competing with FIRST) as a party to this action.

Moreover, as plaintiffs point out, "it is undisputed that due to the existence of the patent no third-parties are selling the patented technology/procedure and that each of these parties challenges the others rights to use the same. This fact establishes that the alleged harm of the defendants is measurable. If a customer wants the product, they must go to either FIRST or Samuel Shatkin FIRST, LLC. If the customer does not go to FIRST as defendants allege, then the damages are measurable through the revenues obtained by the only other entity selling the product - Samuel Shatkin FIRST, LLC. Any harm suffered by defendants, if they can actually sustain their allegations that the termination was wrongful[,] is measurable in monetary damages and does not warrant injunctive relief." (Dkt. #75-2, p. 16).

Although defendants have requested an evidentiary hearing in connection with their motions, "the district court is not required to conduct an evidentiary hearing on a motion for

a preliminary injunction when essential facts are not in dispute". <u>Maryland Casualty Co. v. Realty Advisory Board on Labor Relations</u>, 107 F. 3d 979, 984 (2d Cir. 1997). Given defendants' unexcused delay in moving for a preliminary injunction, coupled with their failure to demonstrate that their injury cannot be remedied by an award of monetary damages, I conclude that they have failed to establish irreparable harm. Since "a preliminary injunction will not be granted unless the applicant shows that irreparable harm will result in the absence of such relief", 13 <u>Moore's Federal Practice (Third Ed. 2007)</u> §65.22[1][b], I need not decide whether defendants have established a likelihood of success on the merits.

Nevertheless, I will address that issue in case my conclusion as to lack of irreparable harm is not adopted by a reviewing court.

### C.     Likelihood of Success on the Merits

#### 1.     Plaintiffs' Allegedly Improper Use of Confidential Information

Plaintiffs point out that the names of dentists who are actual or potential clients for the technology are not a secret, since they have been published on this court's docket and are also available on various web sites, including IMTEC's (Dkt. #75-2, pp. 20-21). In response, IMTEC argues that "the issue is not the list of 1,100 customers . . . . The subject of Defendants' injunction is the IMTEC and/or FIRST customer database . . . [which] includes contract information, buying preferences, ordering history and annual purchasing totals that have been gathered through IMTEC's efforts" (Dkt. #98, pp. 3-4).

However, defendants have submitted no concrete evidence to suggest that plaintiffs have utilized this information, and plaintiffs deny that they have done so. <i>See</i>

Declaration of Dr. Samuel Shatkin (Dkt. #75-3, ¶8); Declaration of Dr. Todd Shatkin (Dkt. #75-7, ¶31). Therefore, as to this claim, I conclude that defendants have failed to establish "either a likelihood of success on the merits, or a sufficiently serious question going to the merits to make them a fair ground for trial". Almontaser, supra.

### 2. The Allegedly Improper Termination of the Licensing/Marketing Agreement

By contrast, I believe that defendants *have* established a likelihood of success on their claim that Dr. Todd Shatkin improperly terminated the Licensing/Marketing Agreement, and, therefore, that his marketing of the patented technology in conjunction with Shatkin FIRST is in violation of the exclusive license granted to FIRST under §3 of that Agreement. Plaintiffs argue that "conduct which defeats a fundamental purpose or goes to the root of a contract serves as a basis for the termination of such agreement without opportunity to cure . . . . This right is in addition to a parties' [*sic*] right to terminate on the basis of a breach of specific contract provisions." (Dkt. #75-2, p. 4). However, "a party is not automatically excused from the future performance of contract obligations every time the other party commits a breach; if a breach is relatively minor and not of the essence, the plaintiff is still bound by the contract and may not abandon performance." 23 Williston on Contracts (4th Ed.) §63:3

Plaintiffs refer to alleged admissions by IMTEC in 2006 that it had not lived up to its obligations to promote the FIRST technology (*see, e.g.*, Dkt. ##75-2, 75-7, ¶¶ 19, 20), and to alleged breaches by Jakson/Dental Tech in dealing with FIRST customers for its own account and in failing to retain a licensed dentist to review cases (*see, e.g.*, Dkt. ##75-3, 75-4, 75-6, 75-7,

104-1, 104-2). Defendants dispute these allegations, and contend that all material contractual obligations were fulfilled (*see, e.g.*, Dkt. ##58, 64, 94, 94-2, 95, 96, 97, 100).

While plaintiffs note that a "contract can be rescinded for breach of its essential terms" (Dkt. #104-1, p. 3), under Oklahoma law a party seeking to rescind a contract for failure of performance must "rescind promptly on discovery of facts entitling rescission". Raydon Exploration, Inc. v. Ladd, 902 F. 2d 1496, 1500 (10th Cir. 1990). Even if defendants *had* breached the Licensing/Marketing Agreement, the record suggests that by waiting until May 22, 2007 to terminate the Agreement, Dr. Todd Shatkin failed to act consistently with a *material* breach by promptly rescinding the Agreement.

For example, on February 13, 2007, long after he was aware of IMTEC's alleged failure to properly market the technology, and after he claims to have become aware of the possibility of Jakson/Dental Tech's alleged improprieties,[2] Dr. Todd Shatkin sent an e-mail to IMTEC, Jakson and Dental Tech (Dkt. #95-5), proposing a meeting to consider the reallocation of the ownership interests of FIRST so as to give Dr. Samuel Shatkin a 25% share of the company, and to reduce the 1/3 shares of himself, Jakson/Dental Tech and IMTEC to 25% each (Dkt. #95-6). The proposed amendment included a stipulation "that all of the parties in the original September 2003 agreement have fulfilled their obligations under that contract with variations during the past 3 years" (Dkt. #95-6). He told IMTEC's general counsel, James Clark, that he proposed the change in ownership "because my dad has been so good to me" (Dkt. #95,

---

[2] Significantly, nowhere in his several affidavits does Dr. Todd Shatkin detail when he began to suspect Jakson/Dental Tech of wrongdoing. However, during oral argument, plaintiffs' attorney, Matthew Beck, stated that Dr. Shatkin developed these suspicions in late January or early February, 2007.

¶33). When asked during oral argument how Dr. Todd Shatkin could have made this proposal if he truly believed that the other parties had materially breached the Licensing/Marketing Agreement, his attorney had no answer.

After Mr. Clark told Dr. Shatkin that IMTEC would not agree to a reallocation of ownership (Dkt. #95, ¶34), on March 2, 2007 Dr. Shatkin sent him an e-mail stating: "Forget the deal! *We'll keep things as they are* and if Ron [Bulard, IMTEC's chairman] chooses to open a new lab with Andy [Jakson] *then FIRST will cease and desist and the patent will revert to me*" (Dkt. #95-4) (emphasis added). Mr. Clark states that upon receiving that e-mail, he "immediately informed Todd Shatkin that IMTEC had no intentions of starting up a new laboratory with Andy Jakson. Thereafter, Dr. Shatkin claimed that Andy Jakson was defrauding the company and was 'stealing.' After receiving this alarming accusation, IMTEC conducted its own independent investigation of Jakson and Dental Tech Labs by conducting an audit at its own expense. IMTEC's audit disclosed that Jakson and/or Dental Tech's violations of the Licensing Agreement, if any, were minor and certainly did not justify terminating the Licensing Agreement." (Dkt. #95, ¶ 35).

Although Dr. Todd Shatkin claims to have been "excluded from participating in the audit" (Dkt. #104-2, ¶27), Mr. Clark states - *and Dr. Shatkin does not deny* - that "on several occasions I asked Dr. Todd Shatkin for proof of Mr. Jakson's alleged dishonesty and pilfering and the response was 'I won't send you my evidence because you'll share it with Andy . . . . you'll have to trust me'" (Dkt. #95, ¶35). It is difficult to understand how Dr. Todd Shatkin can complain of being excluded from IMTEC's investigation of alleged wrongdoing by

Jakson/Dental Tech, while at the same time refusing IMTEC's requests for evidence of that wrongdoing.

It is also worth noting that although plaintiffs now argue that "Jakson and Dental Tech's dishonest conduct *and Imtec's later direction to ignore it (after they attempted a power play by securing a proxy from Jakson)* justified Todd Shatkin DDS's termination" of the Licensing/Marketing Agreement (Dkt. #104-1, p. 4, emphasis added), neither the May 22, 2007 termination notice (Dkt. #61, Ex. I) nor the more detailed state court complaint filed by plaintiffs that same date (Id., Ex. L) mentions IMTEC's "direction to ignore" or "power play" or "proxy" as a reason for termination of the Licensing/Marketing Agreement.

Plaintiffs argue that where a party has made contemporaneous admissions, his "self-serving after-the-fact Affidavit should be disregarded". (Dkt. #75-2, p. 8). "If that argument is true, it applies equally against plaintiffs. As the saying goes, what's good for the goose is good for the gander." Caba v. Frankel, 2007 WL 1017649, *2 (E.D.N.Y. 2007). Based on the record before me, Dr. Todd Shatkin's statements and conduct at the time of the relevant events are exceedingly difficult (if not impossible) to reconcile with his claims of material breach in this litigation. "A court is not obligated to credit a litigant's statement . . . that flies so squarely in the face of the litigant's own prior unequivocal statements and conduct." Brasco, Inc. v. International Graphic Services, Inc., 602 F. Supp. 129, 135 (N.D. Ill. 1984).

II.   **Plaintiffs' Cross-Motion for Partial Summary Judgment**

   A.   **Standard for Relief**

   "Summary judgment is a drastic procedural weapon." Garza v. Marine Transport Lines, Inc., 861 F. 2d 23, 26 (2d Cir. 1988). It is warranted "only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

   However, while the moving party must demonstrate the absence of any genuine factual dispute, the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

   B.   **The Materiality of Defendants' Alleged Breaches**

   In reviewing the evidence in the record, particularly in light of my obligation to draw all reasonable inferences in favor of defendants (Ford v. Reynolds, supra), I cannot possibly conclude that the alleged breaches of the Licensing/Marketing Agreement by IMTEC or

Jakson/Dental Tech are material as a matter of law.[3] "The determination whether a material breach has occurred is generally a question of fact." <u>Zenith Drilling Corp. v. Internorth, Inc.</u>, 869 F. 2d 560, 563 (10th Cir. 1989) (applying Oklahoma law); <u>Williston</u>, <u>supra</u>, §63:3.

### C. The Oklahoma Anti-Forfeiture Statute

Moreover, defendants argue that to the extent that termination of the patent license would result in a forfeiture of FIRST's interests under the Licensing/Marketing Agreement, 23 Okla. Stat. §2 provides for relief from that forfeiture "upon making full compensation to the other party, except in case of grossly negligent, willful or fraudulent breach of duty". Dkt. #100, pp. 14-15; *see also* <u>Power Lift, Inc. v. Weatherford Nipple-Up Systems, Inc.</u>, 871 F. 2d 1082, 1085 (Fed. Cir. 1989) (holding that the application of the Oklahoma anti-forfeiture statute to prevent the termination of a patent license agreement is not preempted by federal law).

While plaintiffs dispute "that Oklahoma law controls the termination of the Licensing Agreement as that agreement contains no choice of law clause and substantially all of the relevant contacts were in New York" (Dkt. #104-1, p. 5), I disagree, for the reasons discussed at p. 2 and footnote 1 of this opinion. Plaintiffs also note that the anti-forfeiture statute does not apply in the case of a "grossly negligent, willful or fraudulent breach of duty" (Dkt. #104-1, p. 5). However, on this record, I cannot determine as a matter of law that defendants breached *any* duty

---

[3] Defendants also argue that plaintiffs' cross-motion should be denied due to the failure of their Statement of Undisputed Facts (Dkt. #75-1) to cite to evidence in the record, as required by Local Rule 56.1(d) (Dkt. #94, pp. 1-2), although plaintiffs belatedly provided the citations (Dkt. #104-4). While this failure could supply an additional basis for denying the cross-motion, the numerous factual issues raised would require its denial in any event.

under the Licensing/Marketing Agreement, much less that the breach was grossly negligent, willful, or fraudulent.

### D. Should Partial Summary Judgment be Rendered Against Plaintiffs?

In fact, as discussed in Point I(C)(2) of this opinion (pp. 8-11, supra), the evidence strongly suggests that Dr. Todd Shatkin *himself* did not believe that defendants' breaches (if any) were material. Although the issue of materiality is generally one of fact, "if there is only one reasonable conclusion, a court must address what is ordinarily a factual question as a question of law." Williston, supra, §63:3; Zenith Drilling, supra, 869 F. 2d at 563 ("materiality . . . can be decided as a matter of law if reasonable minds could not differ on the question") (applying Oklahoma law).

"While it is not necessarily reversible error in our Circuit for a district court to grant summary judgment against the moving party without notice or opportunity to defend", Bridgeway Corp. v. Citibank, 201 F. 3d 134, 139 (2d Cir. 2000), the better practice is "to give clear and express notice before granting summary judgment *sua sponte*". Id. Because plaintiffs may not have anticipated the possibility of summary judgment being rendered *against* them on the question of materiality, I will not address that issue at this time.

If defendants subsequently file a motion for summary judgment in that regard, plaintiffs will be given the opportunity to more fully develop the record, so that I may determine whether there is a *genuine* issue of material fact as to the validity of the stated reasons for terminating the Licensing/Marketing Agreement. "Summary judgment is called for where it clearly appears that the issues are not genuine, but feigned." United National Insurance Co., v.

The Tunnel, Inc., 988 F. 2d 351, 354 (2d Cir. 1993); Feick v. Fleener, 653 F. 2d 69, 77 (2d Cir. 1981) ("courts . . . cannot be swayed by feigned issues").

## CONCLUSION

For these reasons, I recommend that defendants' motions for a preliminary injunction (Dkt. ##52, 57) and plaintiffs' cross-motion for partial summary judgment (Dkt. #75) be DENIED. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order</u>. Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically

identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.</u>

**SO ORDERED.**

DATED:    March 25, 2008

_/s/ Jeremiah J. McCarthy_
JEREMIAH J. MCCARTHY
United States Magistrate Judge