UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TODD E. SHATKIN, DDS,                                **REPORT AND**
SAMUEL SHATKIN, DDS, MD,                             **RECOMMENDATION**


                              Plaintiffs,
                                                     07-CV-00332A(M)

v.

ANDREW JAKSON,
IMTEC CORPORATION,
DENTAL TECH LABORATORIES, LLC,
F.I.R.S.T. LABORATORIES, LLC,

                              Defendants.

_____

         This action was referred to me by Hon. Richard J. Arcara to conduct "all pre-trial

matters", including "hearing and disposition of all non-dispositive motions" and to "hear and

report upon dispositive motions" (Dkt. #11).  Before me are defendants' motions for summary

judgment (Dkt. ##135, 152). Oral argument of the motions was held on June 16, 2008 and, at my

request, the parties submitted additional briefing on June 30, 2008 (Dkt. ##182-185).

         Having considered the record in its entirety, I  recommend that the motions be

GRANTED in part and DENIED in part.


                              **BACKGROUND**

         On September 16, 2003, plaintiff Todd E. Shatkin DDS, along with defendants

Andrew Jakson d/b/a Dental Tech Laboratories, LLC ("Dental Tech") and IMTEC Corporation

("IMTEC"), created a company known as "F.I.R.S.T. Laboratories LLC" ("FIRST") for the

purpose of exploiting certain technology, allegedly developed by Dr. Shatkin, relating to dental

implants (hereafter referred to as the "MDI technology"). In connection with the creation of

FIRST, they executed an "Operating Agreement" (Dkt. #52-2, Ex. A) and a

"Licensing/Marketing Agreement" (Dkt. #52-2, Ex. B), and each of them were granted an

undivided 1/3 interest in FIRST (Id., §1). Although not an owner, plaintiff Samuel Shatkin, DDS

(Dr. Todd Shatkin's father) was named treasurer/manager of FIRST (Dkt. #52-2, Ex. A, p. LLC-

11).

      The Operating Agreement provided that the Licensing/Marketing Agreement

"shall be included in this Operating Agreement in its entirety" (Id., Art. XIII(B)), and further

stated that "irrespective of the place of execution or performance, this Agreement shall be

governed in accordance with the laws of the State of Oklahoma" (Id., Art. XIII(F)).[1]

      Section 3 of the Licensing/Marketing Agreement recited that:

> "Shatkin has conceived an idea and concept for fabricated implant
> restoration of teeth and has filed an application for patent
> protection with the U.S. Patent & Trademark Office in
> Washington, D.C. Shatkin hereby grants to FIRST an exclusive
> license to make, have made, use, lease/sell the TECHNOLOGY
> and LICENSED PRODUCTS . . . . This grant of exclusive license
> shall be revoked upon the dissolution, bankruptcy, or voluntary
> sale of assets of FIRST."

      Section 2 of the Licensing/Marketing Agreement provided that the it "shall

continue so long as IMTEC continues to promote and market certain intellectual properties

granted in an exclusive license to FIRST by Shatkin". Section 3 of that Agreement required

IMTEC to "actively promote the FIRST concept and techniques"; §5 required it to "take steps to

---

[1]     Under Oklahoma law, "separate documents executed as part of the same transaction may be read together as a single agreement". Sunrizon Homes, Inc. v. American Guaranty Investment Corp., 782 P. 2d 103, 107 (Sup. Ct. Okla. 1988).

incorporate the FIRST technique and method into its product lines and . . . market same on a global basis"; and §7 required it to "use its discretion in marketing the FIRST . . . technique and . . . take steps to blend it with [its] current marketing schemes".

Section 3 of the Licensing/Marketing Agreement also required Jakson/Dental Tech to "retain an independent contractor or licensed dentist as a consultant to review and evaluate case treatment plans submitted by customers of FIRST . . . to render[  ] an opinion whether FIRST should create the ordered restoration".

On May 22, 2007 Dr. Todd Shatkin faxed a letter to IMTEC and Jakson/Dental Tech (Dkt. #61, Ex. I), purporting to terminate the Licensing/Marketing Agreement due to allegedly material breaches thereof by IMTEC and Jakson/Dental Tech:

> "Please accept this letter as notice of termination of the Licensing/Marketing agreement dated September 16, 2003 (the 'Agreement'). Both IMTEC Corporation and Andy Jakson d/b/a Dental Tech Laboratories, LLC have materially breached the Agreement.
>
> IMTEC has failed to 'actively promote the FIRST concept and technique in dental journal advertisements, seminars, training courses, professional meetings and trade shows' and has failed to incorporate the FIRST technique and method to its product lines. Jakson and Dental Tech have sent misleading and competitive solicitations to FIRST customers and performed work directly for such customers directly competing with FIRST and Dr. Shatkin. In addition, Jakson and Dental Tech have failed and refused to engage a licensed dentist to review cases. Jakson has gone so far as to represent himself to FIRST customers as being engaged in 'treatment planning.' Such actions are contrary to the express terms of the Agreement . . .
>
> As a result of the above, I hereby terminate the Agreement effective immediately."

Immediately thereafter, the Shatkins began to compete with FIRST through a new company entitled "Samuel Shatkin F.I.R.S.T. LLC" ("SSF").

## The March 25, 2008 Report and Recommendation

In my March 25, 2008 Report and Recommendation (Dkt. #120) (adopted in its entirety by Hon. Richard J. Arcara, 2008 WL 1743481 (Dkt. #145)),  I denied defendants' motions for a preliminary injunction prohibiting plaintiffs from utilizing confidential customer information belonging to IMTEC or FIRST and from competing with FIRST (Dkt. ##52, 57), as well as plaintiffs' cross-motion for partial summary judgment declaring that the termination of the Licensing/ Marketing Agreement was proper (Dkt. #75).

In denying summary judgment to plaintiffs, I noted that the evidence before me at that time "strongly suggests that Dr. Todd Shatkin *himself* did not believe that defendants' breaches (if any) were material . . . . If defendants subsequently file a motion for summary judgment in that regard, plaintiffs will be given the opportunity to more fully develop the record, so that I may determine whether there is a *genuine* issue of material fact as to the validity of the stated reasons for terminating the Licensing/Marketing Agreement" (Dkt. #120, p. 14, emphasis in original).

Defendants now seek summary judgment (1) declaring that Dr. Todd Shatkin's purported termination of the Licensing/Marketing Agreement was not valid and that FIRST has

not been dissolved[2], (2) dismissing plaintiffs' claims, and (3) granting them a permanent injunction (Dkt. ##135, 152).

## DISCUSSION AND ANALYSIS

### I.   Standard for Summary Judgment

"Summary judgment is a drastic procedural weapon." Garza v. Marine Transport Lines, Inc., 861 F. 2d 23, 26 (2d Cir. 1988). It is warranted "only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003). "In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party." Id. "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

However, "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial' . . . . The mere existence of

---

[2]      This aspect of defendants' motions is moot, because plaintiffs concede that FIRST has not been dissolved. Plaintiffs'/SSF's Joint Memorandum (Dkt. #168-1), Point V.

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, ___U.S.___, 127 S.Ct. 1769, 1776 (2007) (emphasis in original).

Although "summary judgment is called for where it clearly appears that the issues are not genuine, but feigned", United National Insurance Co., v. The Tunnel, Inc., 988 F. 2d 351, 354 (2d Cir. 1993), "it remains true that summary judgment is improper when the court merely believes that the opposing party is unlikely to prevail on the merits after trial . . . . the responsibility of the district judge on a motion for summary judgment is merely to determine whether there are issues to be tried, rather than to try the issues himself". American International Group, Inc. v. London American International Corp., 664 F. 2d 348, 351 (2d Cir. 1981);10A Wright-Miller-Kane, Federal Practice & Procedure: Civ. 3d, §2725 ("a party moving for summary judgment is not entitled to a judgment merely because the facts the party offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial").

With these principles in mind, I will address each of the grounds upon which defendants seek summary judgment.

## II.    Rescission versus Termination

Defendants claim that Dr. Todd Shatkin has purported to rescind the Licensing/ Marketing Agreement, and argue that "rescission and cancellation of a contract is only available when the situation is such that the parties can be placed back in the same position they were in prior to the making of the contract, or returned to the parties' 'status quo'". IMTEC/ FIRST/Bulard's Memorandum of Law (Dkt. #139), p. 20; Jakson/Dental Tech's Memorandum of Law (Dkt. #152-2), p. 14 (citing Berland's, Inc. v. Northside Village Shopping Center, 506 P. 2d 908 (Sup. Ct. Okla. 1972)).

Plaintiffs counter that "this was a termination, not a rescission. The law has distinguished the two". Plaintiffs'/SSF's Joint Memorandum (Dkt. #168-1), p. 24. Oklahoma[3] recognizes that "there is a distinction between rescission and termination of a contract . . . . 'Termination' of a partially performed executory contract is to end it as to the unperformed remainder. 'Rescission,' on the other hand, is broader in scope and contemplates an annulment so that the contract is voided ab initio *accompanied by restoration of the parties to the precontract status.*" M & W Masonry Construction, Inc. v. Head, 562 P. 2d 957, 961 (Okla. App. 1976) (emphasis added). Thus, under Oklahoma law, restoration of the "status quo" is required for rescission, but not for termination.

---

[3]    Oklahoma law governs this transaction. *See* my March 25, 2008 Report and Recommendation (Dkt. #120), pp. 2, 13.

**III.     Did Plaintiffs Contractually Limit Their Right to Terminate for Material Breach?**

          Under Oklahoma law, "a substantial breach by [one party] gives the [other party] the right to terminate the agreement." M & W Masonry, supra, 562 P. 2d at 961. However, defendants argue that termination of the Agreement or of the license for the MDI Technology is prohibited absent their written consent, citing Article V(E) of the Operating Agreement (which prohibits the "transfer of any interest in any property"or "any act which makes it impossible to carry on the ordinary business of the Company" absent "the consent of two-thirds in interest of the Members") (Dkt. #139, pp. 14-15) and §14 of the Licensing/Marketing Agreement (which prohibits "termination or discharge of this agreement . . . unless confirmed by a written instrument signed by officers of both parties").[4] IMTEC/FIRST's June 30, 2008 Letter Brief (Dkt. #185), pp. 1-2. They also argue that ¶3 of the Licensing/Marketing Agreement conditions revocation of the technology license upon the "dissolution, bankruptcy, or voluntary sale of assets" of FIRST, and claim that because these events have not occurred, the license may not be revoked. IMTEC/FIRST's Memorandum of Law (Dkt. #139), p. 22.

          Defendants overlook the fact that "under well established common law rules, a party in material breach of a contract cannot enforce . . . the contract." Dollar Rent A Car Systems, Inc. v. P.R.P. Enterprises, Inc., 2006 WL 1266515, *23 (N.D. Okla.2006), aff'd, 242 Fed. Appx. 5884, 2007 WL 22003603 (10th Cir. 2007); Owens v. Automotive Engineers, Inc., 255 P. 2d 240, 247 (Sup. Ct. Okla.1953). While the parties could have expressly limited their

---

[4]      The reference to "both parties" is curious, as there are three parties to that Agreement.

right to terminate for material breach,[5] they did not do so in this case.  Therefore, if plaintiffs can prove that defendants materially breached the Licensing/Marketing Agreement, then defendants cannot enforce the other contractual provisions which limit the circumstances under which termination can occur.

## IV.   Were Defendants' Alleged Breaches "Material"?

Under Oklahoma law, "a material breach justifying recision or termination of a contract occurs when such failure defeats the object of the contract, or when it concerns a matter of such importance that the contract would not have been made if default in that particular had been expected or contemplated." Zenith Drilling Corp. v. Internorth, Inc., 869 F. 2d 560, 563-64 (10th Cir. 1989).  However, "a party is not automatically excused from the future performance of contract obligations every time the other party commits a breach; if a breach is relatively minor and not of the essence, the plaintiff is still bound by the contract and may not abandon performance." 23 Williston on Contracts (4th Ed.), §63:3.

"Although the materiality of a contractual breach usually is a question of fact for the jury, . . . [it] can be decided as a matter of law if reasonable minds could not differ on the question". Zenith Drilling, supra, 869 F. 2d at 563; Williston on Contracts, supra, §63:3. I must

---

[5]     See The Parking Company L.P. v. Rhode Island Airport Corporation, 2005 WL 419827, *8 (R.I. Super. 2005) (unpublished) (refusing to allow termination for material breach where the contract stated that "except for those provisions of the Agreement specifically allowing termination, neither party shall have the right to terminate this Agreement because of breach or default of the other party"); see also Bausch & Lomb. Inc. v. Bressler, 977 F. 2d 720, 727 (2d Cir. 1992) ("Section 8.02 . . . limited the ability of an aggrieved party to terminate the Agreement by providing that, upon the occurrence of a material breach, the aggrieved party could cancel the Agreement only upon 30 days notice during which time the breaching party could attempt to effect a cure").

therefore decide whether each of the alleged breaches claimed by Dr. Todd Shatkin presents a question of fact or one of law:

### A.   IMTEC's Failure to Promote or Market the MDI Technology

Dr. Todd Shatkin claims that IMTEC materially breached the Licensing/ Marketing Agreement by failing to promote and market the MDI technology in 2006 and earlier. Declaration of Todd Shatkin, DDS (Dkt. #168-2), ¶¶ 24 *et. seq.* Whether or not this is true is irrelevant for purposes of this motion, since it is undisputed that Dr. Shatkin, with full knowledge of IMTEC's alleged failures, advised IMTEC that he would continue to abide by the Agreement. For example, in a February 26, 2007 e-mail to IMTEC's general counsel, James Clark, he stated: "I am totally dedicated to continue serving IMTEC and FIRST Lab to the best of my ability . . . . I have no intention of doing anything that would hurt IMTEC . . . . I consider all of you at IMTEC my extended family and look forward to many more years together". Affidavit of Ronald A. Bulard (Dkt. #136), Ex. D. On March 1, 2007, he e-mailed Mr. Clark, stating: "I will continue to work on behalf of IMTEC to promote the MDI and all related products as I have been for the past 7 years". Id., Ex. E. On March 2, 2007, he e-mailed Mr. Clark and Ron Bulard, IMTEC's chairman, stating: "we'll keep things as they are and if Ron chooses to open a new lab with Andy [Jakson] then FIRST will cease and desist and the patent will revert to me". Id., Ex. F.[6]

---

[6]   In his May 22, 2008 Declaration, Dr. Shatkin mischaracterizes the content of this e-mail, claiming that it stated "that things would be left as they were (*for the time being*)". Dkt. #168-2, ¶58 (emphasis added). However, his e-mail does *not* state "for the time being", and the absence of that phrase is significant.

In light of these contemporaneous statements by Dr. Shatkin, his claim that he considered IMTEC's failure to promote or market the MDI technology to be a material breach justifying his termination of the Licensing/Marketing Agreement should be rejected as a matter of law. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, supra, 127 S. Ct. at 1776; Brasco, Inc. v. International Graphic Services, Inc., 602 F. Supp. 129, 135 (N.D. Ill. 1984) ("a court is not obligated to credit a litigant's statement . . . that flies so squarely in the face of the litigant's own prior unequivocal statements"). Having advised IMTEC that he would continue to abide by the Licensing/Marketing Agreement, Dr. Shatkin could not thereafter rely upon IMTEC's alleged failure to promote or market the MDI technology as a basis for termination. "Any act by the injured party indicating an intent to continue performance is deemed a conclusive election". Sitlington v. Fulton, 281 F. 2d 552, 555 (10th Cir. 1960) (applying Oklahoma law); Williston on Contracts, supra, §43:15 ("the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach").

Although I conclude that plaintiffs have raised a genuine issue of material fact as to the materiality of the other claimed breaches by defendants (*see* pp. 12 - 22, *infra)*, there is no such issue as to this alleged breach, and partial summary judgment in that regard is therefore appropriate. "A court may . . . grant partial summary judgment as to a particular legal theory that underlies a claim, and then restrict the evidence accordingly . . . . [or] make a partial summary

judgment ruling that resolves issues of both fact and law." 11 <u>Moore's Federal Practice (Third Ed. 2008)</u>, §56.40[2]; <u>Gillette v. Delmore</u>, 886 F. 2d 1194, 1199 (9th Cir. 1989) (granting partial summary judgment determining that certain comments by plaintiff were not "protected speech").[7]

Accordingly, I recommend that it be deemed established that IMTEC's alleged failure to promote or market the MDI technology prior to March 2, 2007 (the date of Dr. Shatkin's e-mail stating "we'll keep things as they are") was not a valid basis for Dr. Shatkin's termination of the Licensing/Marketing Agreement.

### B.      Dental Tech/Jakson's Unauthorized Practice of Dentistry

Paragraph 3 of the Licensing/Marketing Agreement requires Jakson/Dental Tech to "employ or retain an independent contractor or licensed dentist as a consultant to review and evaluate case treatment plans submitted by customers of FIRST. The consultant, at Jakson's expense, will review the submitted file . . . prior to rendering an opinion whether FIRST should create the ordered restoration".

Dr. Todd Shatkin alleges that on March 9, 2007 (*after* he had sent the e-mails stating that he would continue to abide by the Licensing/Marketing Agreement), he learned that a customer of FIRST (Steve Brown, DDS) had received a surgical stent from Dental Tech, after submission to FIRST, which had not been treatment planned by a dentist. Declaration of Dr. Todd Shatkin (Dkt. #168-2), ¶¶60-61, Ex. N; Reply Declaration of Steve Brown, DDS (Dkt. #104-6), ¶¶3-5. Although Dr. Samuel Shatkin had initially referred this case to Dental Tech on

---

[7]      *But see* <u>Evergreen International, S.A. v. Marinex Construction Co., Inc.</u>, 477 F. Supp, 2d 697, 699 (D. S. C. 2007) ("a party is simply not entitled to summary judgment if the judgment would not be dispositive of an entire claim").

November 9, 2006 for initial preparatory work, no treatment sheet was prepared by Dr. Samuel

Shatkin until March 13, 2007, after he had learned that the initial stent was provided by Dental

Tech without a treatment sheet signed by a dentist. Declaration of Mark Hager (Dkt. #94-2), Ex.

I; Declaration of Dr. Samuel Shatkin (Dkt. #167), ¶¶8-11.

   In a letter dated March 26, 2007, Dr. Brown stated that he had received a surgical

guide stent from Dental Tech for an MDI for use with his patient, which "did not look or work

properly . . . I could tell that the case had not been planned by any dentist, let alone Dr. Samuel

Shatkin or Dr. Todd Shatkin . . . . the implants couldn't be placed in the locations designated by

the stent because they were angled improperly for the patient's jaw". Declaration of Steve

Brown, DDS (Dkt. #75-4), Ex. A.  He stated that "my career and license are put at risk when I

tell patients that an experienced implant dentist helps me plan my cases and design the stent,

when, in fact . . . this case was treatment planned entirely by a Dental Tech Laboratory

technician. I am very concerned about the repercussions for this, especially the legality of this

practice . . . .  Should this happen again, I will have to look for another lab for my needs." Id.

   Defendant Jakson insists that Dental Tech  "fills prescriptions from licensed

dentists only, and with respect to work performed for FIRST, always uses a consulting dentist",

Declaration of Andrew Jakson (Dkt. #152-3), ¶3, and that "we already have established that the

Roy Cox case was planned by Dr. Benjamin Oppenheimer". Declaration of Andrew Jakson (Dkt.

#175-5), ¶20.  However, he fails to specify where in the record this fact has been "established",

and Dr. Oppenheimer himself, who has submitted two affidavits in this case (Dkt. ##29-4, 175-

6), does not claim to have "planned" the case for Dr. Brown's patient.

Dr. Todd Shatkin categorically alleges that "at no point in this proceeding has Jakson or Dental Tech ever produced a treatment planning and review sheet for this case signed by Dr. Samuel Shatkin or any other licensed dentist. Such sheets were always provided to Dental Tech with every case submitted to FIRST for treatment planning and/or stent fabrication". Declaration of Dr. Todd Shatkin (Dkt. #168-2), ¶63. Defendants fail to rebut that allegation - in fact, during oral argument of the motion, Jakson/Dental Tech's attorney, Gregory Zini, admitted that the treatment planning sheet (if it exists) was not among the documents produced by his client in discovery. "The failure to produce it or to explain why it was not produced may give rise to an inference that it would have been unfavorable . . . and preclude a grant of summary judgment." Stonehill v. Security National Bank, 68 F.R.D. 24, 40-41 (S.D.N.Y.1975).

While defendants point out that the New York State Department of Education's investigation into Jakson/Dental Tech's alleged unauthorized practice of dentistry was dropped in February 2008, Declaration of Gregory Zini (Dkt. #152-3), Ex. C, that factor does not have preclusive effect in this litigation, particularly where it is unclear what evidence was considered by that body. On the record  before me, I cannot conclude that reasonable minds could not differ on the question of whether Jakson/Dental Tech materially breached the Licensing/Marketing Agreement by failing to have the case of Dr. Brown's patient reviewed by a licensed dentist or other independent consultant.[8] See Zenith Drilling, supra, 869 F. 2d at 563 ("the determination whether a material breach has occurred is generally a question of fact"). Moreover, the alleged

---

[8]     While plaintiffs maintain that each case had to be reviewed by a licensed dentist, ¶3 of the Licensing/Marketing Agreement called for review by "an independent contractor *or* licensed dentist". However, Dental Tech has produced no records of evaluation of the case of Dr. Brown's patient by either an independent contractor or a licensed dentist (until the case was subsequently reviewed by Dr. Samuel Shatkin).

improper practice of dentistry by Dental Tech is not limited to the case of Dr. Brown's patient.
*See* Declaration of former Dental Tech employee Peter Wanat (Dkt. #75-6), ¶¶ 13-15 (stating that
he observed Dental Tech employees "reading x-rays . . . marking surgical implant locations on
such x-rays . . . [and] advising] at least one dentist over the phone to take an implant out of a
patient's mouth and move it over").

     However, I wish to emphasize that, while I may not resolve issues of credibility
on a motion for summary judgment (<u>Fischl v. Armitage</u>, <u>supra</u>), I have serious concerns as to the
veracity of plaintiffs' chronology of events relating to the case of Dr. Brown's patient. The date
on which Dr. Todd Shatkin learned of Dental Tech's alleged mishandling of that case is very
significant, for if he learned of it before sending the previously discussed e-mails dated February
26, March 1 and March 2, 2007, then the inescapable conclusion is that he either did not consider
it to be a material breach of the Licensing/Marketing Agreement, or that regardless of its
materiality, he had elected to continue with performance of the Agreement (<u>Sitlington v. Fulton</u>,
<u>supra</u>). On the other hand, if he learned of it after he sent those e-mails, then they do not
necessarily foreclose the possibility of termination.

     In my March 25, 2008 Report and Recommendation, I noted that "based on the
record before me, Dr. Todd Shatkin's statements and conduct at the time of the relevant events
are exceedingly difficult (if not impossible) to reconcile with his claims of material breach in the
litigation" (Dkt. #120, p. 11). In particular, I pointed to Dr. Shatkin's February 13, 2007 e-mail
proposing that his father be given a 25% ownership interest in FIRST, coupled with an
acknowledgment that "the parties to the original September 2003 agreement have fulfilled their

obligations under that contract with variations during the past 3 years" (id., p. 9), as well as his

March 2, 2007 e-mail stating "we'll keep things as they are" (id., p. 10).

Plaintiffs argue that "while Todd Shatkin did have suspicions concerning Jakson

and Dental Tech by late January or early February, 2007, he did not become aware of the

unauthorized practice of dentistry until March 9, 2007". Plaintiffs'/SSF's Joint Memorandum

(Dkt. #168-1), p. 22. This assertion appears questionable, to say the least. Dr. Brown, who admits

to having a separate business relationship with Dr. Todd Shatkin (Dkt. #75-4, ¶2), stated on two

separate occasions that he received the stent for his patient and the solicitation package from

Dental Tech at approximately the same time: "*around that same time* I received the stent . . ., I

received a mailer 'kit' from Dental Tech Lab including coupons to discount my cases with them

. . . . I was confused as to why I received all of this without solicitation. It appeared to me that

Dental Tech Lab was trying to 'cut out the middle man' by dealing directly with me in this

regard". Declaration of Steve Brown, DDS (Dkt. #75-4), Ex. A, p. 2 (emphasis added); Reply

Declaration of Steve Brown, DDS (Dkt. #104-6), ¶8 ("*at or about the same time* of this case I

received a solicitation package from Dental Tech") (emphasis added).

Dr. Todd Shatkin states that "between February 1 and February 4, 2007, my

father . . . and I visited Steve Brown, DDS in Fort Worth, Texas . . . . During this visit, Dr.

Brown gave me a solicitation package that he had received from Dental Tech." Declaration of

Todd Shatkin, DDS (Dkt. #168-2), ¶49. Given Dr. Brown's professed level of concern about

Dental Tech's alleged mishandling of his patient's case, I find it exceedingly difficult to believe

that he would not have discussed that subject with the Shatkins during their meeting in early

February (which was several weeks *prior* to Dr. Todd Shatkin's e-mails stating that he would continue to abide by the Licensing/Marketing Agreement).

Moreover, Dr. Todd Shatkin acknowledges that on March 9, 2007, "Dr. Brown told me that *he had called my father* on this case because it appeared that the surgical stent had not been treatment planned properly". Declaration of Todd Shatkin, DDS (Dkt. #168-2), ¶60 (emphasis added). Although he does not say when this conversation occurred, in context it is clear that Dr. Brown must have spoken to Dr. Samuel Shatkin prior to March 9, 2007. Given the close relationship between the Shatkins, it strains credulity to believe that Dr. Samuel Shatkin would not have mentioned this to Dr. Todd Shatkin as soon as he learned of it from Dr. Brown.

Nevertheless, notwithstanding my serious doubts as to the timeline suggested by plaintiffs, I am not the trier of fact. Therefore, I conclude that the credibility of plaintiffs' chronology of events should be decided by a jury at trial.

### C.   Dental Tech/Jakson's Alleged Diversion of Business from FIRST

#### 1.   Conventional (Non-MDI) Business

While stating that "it has never been [their] position that Dental Tech was not permitted to continue to do conventional work for its pre-existing customer base", plaintiffs contend that "a breach arose, however, when Jakson solicited and diverted customers introduced through FIRST for Dental Tech's own account". Plaintiffs'/SSF's Joint Memorandum (Dkt. #168-1), p. 13. Plaintiffs claim that they "did not confirm the diversion of business until late March 2007". Id., p. 22.

Defendants admit that "Dental Tech performed non-Technology related work for FIRST customers", Declaration of Andrew Jakson (Dkt. #175-5), ¶22, but argue that this was permissible because "FIRST was not a full-service laboratory". Id. While it appears from the Licensing/Marketing Agreement that FIRST was created primarily for the purpose of exploiting the MDI technology, FIRST itself alleges that it intended to "promote itself as a full-service, national dental lab that provided case planning and consultation with dentists, and the fabrication of crowns, dentures and bridges". FIRST's Answer and Counterclaims (Dkt. #14), p. 15, ¶6. Moreover, as noted by plaintiffs, "FIRST's website listed both implant and conventional fixed and removable lab work". Declaration of Todd Shatkin, DDS (Dkt. #75-7), ¶37 and Ex. K.

Although there is evidence that plaintiffs agreed at a meeting on February 24, 2006 "that Andy (i.e. Dental Tech) would be able to market non mini dental implant restorations to FIRST Lab customers", Affidavit of Jacob Oppenheimer (Dkt. #94-7), ¶14, in an April 9, 2007 e-mail to Dr. Todd Shatkin, IMTEC's general counsel, James Clark, stated that Jakson/Dental Tech "had an absolute fiduciary obligation to the company [FIRST] to channel customers through FIRST, not to divert them to his lab at a discounted fee". Declaration of Todd Shatkin, DDS (Dkt. #168-2), Ex. Z. "A limited liability company . . . involves a fiduciary relationship." Am. Jur. 2d, Limited Liability Companies, §11; McConnell v. Hunt Sports Enterprises, 725 N.E.2d 1193, 1214 (Ohio App. 1999); see also 18 Okla. Stat. Ann. §2016.

Under these circumstances, I find that plaintiffs have raised a triable issue of fact as to whether Jakson/Dental Tech materially breached the Licensing/Marketing Agreement by performing conventional work for customers whom they first learned of through their affiliation with FIRST.

-18-

2.      **MDI Business**

Plaintiffs allege that Dental Tech/Jakson also diverted MDI work from FIRST. While the parties disagree as to whether Dental Tech/Jakson was allowed to perform conventional work for FIRST customers, they agree that diversion of MDI work would be improper.

Plaintiffs offer account histories and billing information allegedly establishing various instances in which Dental Tech sold FIRST procedures and MDI work directly to FIRST customers. Declaration of Matthew Beck, Esq. (Dkt. #171), ¶¶11-31. Moreover, the Shatkins allege that Dental Tech attempted to bill the case of Dr. Brown's patient (which was an MDI case) for its own account, and only agreed to bill for FIRST's account after its misconduct had been discovered. Declaration of Todd Shatkin, DDS (Dkt. #168-2), ¶62; Declaration of Samuel Shatkin, DDS, MD (Dkt. #167), ¶10.

Dental Tech/Jakson contest a number of the alleged diversions through the Declaration of Dental Tech's Operational Manager, Mark Hager (Dkt. #175-4). However, Mr. Hager concedes that at least one of the cases, "a case produced for dentist Marvin Bush, and his patient . . . appears to have been *erroneously* billed through Dental Tech and not FIRST" (Id., ¶12, emphasis in original). While he argues that "the billing error was not intentional" (Id.), "summary judgment is generally inappropriate where questions of intent . . . are involved". Gelb v. Board of Elections of the City of New York, 224 F. 3d 149, 157 (2d Cir. 2000).

Moreover, there is other evidence of Dental Tech's diversions, including the March 23, 2007 letter (later attested to under the penalty of perjury) of Jiri Novotny, a Dental Tech employee from February 2004 through October 2006, stating: "I saw numerous Mini

Implant Denture Cases belonging to out of town FIRST Lab dentists placed in Beige Lab Pans

which indicates that these are not FIRST Lab cases and are being handled though Dental Tech

Lab" (Dkt. #104-7); Declaration of Dr. Todd Shatkin (Dkt. #168-2, ¶71).

On this record, I find that plaintiffs have raised a triable issue of fact as to whether

Jakson/Dental Tech materially breached the Licensing/Marketing Agreement by performing MDI

work for their own account rather than on behalf of FIRST.


### D.      IMTEC's Refusal to Address Jakson/Dental Tech's Breaches

In addition to the breaches asserted in his termination letter, Dr. Todd Shatkin

alleges that his decision to terminate was also based on IMTEC's refusal to address

Jakson/Dental Tech's diversion of business and unauthorized practice of dentistry. Declaration of

Dr. Todd Shatkin (Dkt. #168-2,  ¶120). Plaintiffs allege that IMTEC breached its fiduciary duty

to act in good faith by failing to address Dental Tech/Jakson's breaches of the

Licensing/Marketing Agreement when Dr. Todd Shatkin presented it with "irrefutable

documentary evidence that Jakson had diverted FIRST customers". Plaintiffs'/SSF's Joint

Memorandum (Dkt. #168-1), p. 9.

Although Dr. Shatkin's failure to mention this factor in his May 22, 2007

termination letter may affect his credibility at trial, it does not necessarily preclude plaintiffs from

invoking it in opposition to defendants' motions. "The party terminating a contract need not

explain the reason(s) for termination at the time of termination, as long as a legally adequate

reason exists." Dollar Rent A Car Systems, supra, 2006 WL 1266515, * 23.

According to Dr. Shatkin, upon learning of Jakson/Dental Tech's improprieties, on or about March 22, 2007 he instructed FIRST's delivery service to route all shipments addressed to FIRST's principal office instead of directly to Dental Tech and contacted his attorney. Declaration of Todd Shatkin, DDS (Dkt. #168-2), ¶¶67, 69.  On March 23, 2007, Dr. Samuel Shatkin, as the treasurer of FIRST, requested that Dental Tech undergo an independent audit of its activities since September 2006 (Id., Ex. Q).  Dr. Todd Shatkin alleges that he and his attorney, Gregory Photiadis, met with IMTEC on April 5, 2007 and they reached an agreement that Jakson would be bought out and that IMTEC and Dr. Todd Shatkin would become 50% partners in FIRST (Id. at ¶¶77-87).

Dr. Todd Shatkin claims that on May 9, 2007, he first learned that Dental Tech had granted IMTEC a revocable proxy on March 9, 2007 to vote its ownership interest in FIRST (Id. at ¶112); Declaration of Ronald Bulard (Dkt. #136-9, Ex. H).  At this time, Dr. Todd Shatkin also learned that IMTEC had scheduled a meeting of FIRST to move the business to Oklahoma, and that IMTEC intended to send all lab work directly to Dental Tech as had been done in the past (Id.).  As a result, Dr. Samuel Shatkin resigned from FIRST on May 10, 2007 "because of the risk to [his] profession license and potential malpractice claims".  Declaration of Dr. Samuel Shatkin (Dkt. #167, ¶6).

Dr. Todd Shatkin asserts that on May 18, 2007, he reached a verbal agreement with IMTEC's general counsel, James Clark, for the sale to him of IMTEC and Dental Tech's interest in FIRST, and Clark agreed to forward him a written agreement memorializing their understanding by May 21, 2007.  Declaration of Dr. Todd Shatkin (Dkt. #168-2, ¶117). When this deadline lapsed without receipt of the written agreement or the results of Dental Tech's

audit, Dr. Shatkin terminated the Licensing/Marketing Agreement on May 22, 2007 (Id. at

¶118).

Although defendants dispute these allegations, I find that they raise a genuine

issue of material fact as to whether IMTEC's failure to respond to Jakson/Dental Tech's alleged

improprieties constituted a breach of fiduciary duty or material breach of the Licensing/

Marketing Agreement. I further conclude that there is a genuine issue of material fact as to

whether Dr. Todd Shatkin unduly delayed in terminating the Licensing/Marketing Agreement.

"Whether the right to terminate has been exercised promptly is a question of fact to be

determined by the jury under a standard of reasonableness." Zelinger v. Uvalde Rock Asphalt

Co., 316 F. 2d 47, 53 (10th Cir. 1963); Southland Corp. v. Mir, 748 F. Supp. 969, 986 (E.D.N.Y.

1990) ("We find that the claimed two month delay in termination, during which Southland

continued its investigation of the . . . fraud scam and consulted with its counsel to determine

what course of action to take, was not an unreasonable time within which to exercise the right of

rescission").


**V.      Plaintiffs' Other Claims**

Although defendants also seek summary judgment dismissing *all* of plaintiffs' claims, they

do not address these claims in their motions, other than to argue that "as all of [plaintiffs'] claims flow

from the purported termination, summary judgment in favor of Defendants on Plaintiffs' claims is

appropriate". Jakson/Dental Tech's Memorandum of Law (Dkt. #152-2), p. 14.

However, because I cannot determine as a matter of law whether the Licensing/Marketing Agreement was improperly terminated, I recommend that defendants' motions for summary judgment dismissing plaintiffs' other claims likewise be denied.

## VI.    Injunctive Relief

Defendants also seek summary judgment permanently enjoining plaintiffs and SSF from utilizing or marketing the MDI technology or otherwise competing, directly or indirectly, with FIRST and/or IMTEC "based upon Todd Shatkin's continued violations of his duties and obligations under the terms of the Licensing Agreement, including not only the exclusive license, but also his covenants of cooperation, non-competition and confidentiality". Defendants' Reply (Dkt. #176), p. 16.  However, defendants concede that their entitlement to permanent injunctive relief is "contingent upon [their] success on the pending Motion for Summary Judgment" concerning termination of the Licensing/Marketing Agreement. IMTEC's Reply Memorandum (Dkt. #176), p. 12.

Since I am unable to conclude as a matter of law that the Licensing/Marketing Agreement was improperly terminated,  I  recommend that defendants' motions for a permanent injunction be denied. Accordingly, I need not reach the issue of whether the MDI technology marketed by SSF infringes U.S. Patent No. 7,108,511 (the "'511 Patent"), which Dr. Todd Shatkin exclusively licensed to FIRST pursuant to the Licensing/Marketing Agreement.[9]

---

[9]     Dr. Samuel Shatkin now contends that "SSF's components and methods are sufficiently different from the components and methods outlined in Todd's patent that SSF is not using the patented technology". Declaration of Samuel Shatkin, DDS, MD (Dkt. #167), ¶26; *see also* Affidavit of C. Richard Lohrman (Dkt. #167-2). Defendants have not had the opportunity to respond to this assertion, nor is their response necessary for purposes of this motion. I note, however, that because ¶13 of the

# CONCLUSION

Because I am convinced that no jury could *reasonably* conclude that IMTEC's alleged failure to promote or market the MDI technology was a legitimate basis for Dr. Todd Shatkin's termination of the Licensing/Marketing Agreement, I recommend that defendants' motions for summary judgment (Dkt. ## 135, 152) be GRANTED to the extent of eliminating that basis for termination from the jury's consideration.

However, although I believe that plaintiffs will face an uphill battle in convincing a jury that Dr. Shatkin's other reasons for terminating the Agreement were legitimate, I find that plaintiffs have submitted sufficient evidence to create a genuine issue of material fact in that regard, and I therefore recommend that the remainder of defendants' motions be DENIED. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and

---

Licensing/Marketing Agreement (if not terminated) prohibits Dr. Todd Shatkin from involvement in a "*similar* business to the FIRST Fabricated Implant Restoration and Surgical Technique and Protocol" (emphasis added), whether or not the SSF product *actually* infringes the '511 patent may not be the end of the court's inquiry, at least as far as his involvement with SSF is concerned. For example, as of June 6, 2008, Dr. Todd Shatkin's website (Dkt. #175-9, Ex. D) described himself as the developer of the "FIRST Technique" covered by the '511 Patent, and encouraged interested customers to contact SSF for further information. From this, it may be inferred that he was, at a minimum, involved with a "similar" technology to that of FIRST.

Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.

**SO ORDERED.**

DATED:      August 1, 2008

JEREMIAH J. MCCARTHY
United States Magistrate Judge